NOT DESIGNATED FOR PUBLICATION

No. 121,176

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRIAN LYNN SMITH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Chase District Court; MERLIN G. WHEELER, judge. Opinion filed May 29, 2020.
Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Kurtis Wiard*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., WARNER, J., and ROBERT J. WONNELL, District Judge, assigned.

PER CURIAM:  A jury convicted Brian Lynn Smith of criminal threat for having threatened to kill his mother. Smith contends that the district court improperly admitted evidence at trial of his two prior convictions for attempted second-degree murder. He also contends that the district court erred by denying his motion for a new trial because a juror had prior knowledge about his convictions. Finding no reversible error, we affirm.

*Factual and Procedural Background*

*The incident*

In November 2018, Brian Smith was living with his mother, Berta Brookshire. One afternoon, he returned home after drinking at a neighbor's house. Brookshire and Smith began arguing and hitting each other with a rolled-up newspaper. When Brookshire asked him to help start winterizing the home, Smith became belligerent. Brookshire told him that if "he didn't straighten up," she would get rid of the dog that she had bought him for his birthday. At this, Smith became so furious that Brookshire called 911, hoping the police would remove Smith from the house and keep him until he sobered up. As Brookshire called, Smith yanked the phone out of her hand and threw it on the floor. But the dispatcher traced the call and dialed back.

The State played a recording of this call for the jury. Brookshire told the dispatcher that her son was irate, he had been physical, and she wanted help. Throughout the call, Smith could be heard yelling at his mother for calling the police, cussing at her, and accusing her of overreacting. The dispatcher asked Brookshire if Smith had access to a weapon, and she responded no. And the call abruptly ended. At trial, Brookshire testified that Smith had again taken the phone from her hand and thrown it away from her.

When the dispatcher called back again Brookshire picked up. Smith was yelling in the background. At one point, he said "Imma kill her" or "I'm a killer." Then the call abruptly ended.

Officer Aaron Hoffman arrived and found Smith outside the residence. After a short standoff, Hoffman handcuffed Smith and took him to jail. After interviewing Brookshire, Hoffman wrote a witness statement which Brookshire dictated, reviewed,

and signed. In it she stated that Smith had threatened to kill her. Based on this information, the State charged Smith with criminal threat. But at trial Brookshire testified that she thought Smith was just threatening to kill the dog.

*The in limine hearing*

Before trial, the State filed a notice of intent to offer evidence of Smith's two convictions in 2000 for attempted second-degree murder. The district court held an evidentiary hearing at which Judge W. Lee Fowler presided. Rick Craig, the lead detective from Smith's 2000 case testified that Smith had entered a Payless Shoe Store, pointed a handgun at the clerk, then shot a man in the store twice—once in the buttocks and once in the face. Smith had pleaded to two counts of attempted second-degree murder.

Smith also testified about the events in 2000. He said he was high on methamphetamine at the time, a voice had told him to kill the stranger, and, afterward, he tried to kill himself but the gun misfired.

Brookshire testified that in November 2018, when Smith made the threats here, she knew about Smith's prior convictions for attempted second-degree murder.

The State argued the prior convictions would help show that Smith intended to create fear in Brookshire, as is necessary under K.S.A. 2019 Supp. 21-5415 (defining criminal threat as any threat to commit violence communicated with intent to place another in fear).

> "We anticipate that there'll be evidence, and the Court even heard some of it today, that [Brookshire] knew about this prior case. And, therefore, when he makes the statements that we intend to prove that he intended to kill her, that part of the proof of the

3

intent to create fear is this background, in fact, the victim knew about it. So that's the primary point that we believe that it's relevant on."

In other words, because Smith knew that Brookshire knew about his previous conviction, it was reasonable to infer that Smith knew that Brookshire would believe he was capable of murder. And the State argued that this inference would show that Smith intended for his statement to place Brookshire in fear.

Smith's counsel raised three possibilities of what Smith had said or meant: (1) "'I'm a killer,'" (2) "'I'm gonna kill her [meaning Brookshire],'" and "'I'm gonna kill her [meaning the dog].'" He noted his intent to argue at trial that when Smith said "kill her," he meant he would kill the dog. He argued that Smith's prior convictions were irrelevant because the victim's subjective state of mind is irrelevant to proving criminal threat.

The district court granted the State's motion to offer evidence of Smith's prior convictions for attempted second-degree murder:

"The Court's decision is it does appear to be part of the res gestae, the actual threat itself, but I'm going to authorize the use of 60-455 evidence in this case as it relates to these two charges, attempted second degree murder. Although, I don't know how the evidence is going to play out, it's clear there's evidence with the tape-recording 911 call where the word, 'I'm a killer,' the exact language might be disputed at trial, but certainly sufficient to—with the evidence today presented that the victim in this fact case knew, in fact, that he had been charged and convicted with attempted murder is in and of itself enough to show a communication of a threat to do violence with intent to place another in fear as required by the statute of criminal threat. It would be a chilling statement to be heard by somebody who knew that the person conveying that statement was, in fact, or had been, in fact, convicted of two counts of attempted murder. So I think it's appropriate, under the facts of this case, that that evidence come in.

"Now, the form that it comes in obviously can be through the testimony of the officer who can identify the defendant and identify the facts of the case. The details

4

maybe aren't all that important, but it's really the—what the victim knew and the fact that he conveyed the fact that he was a killer to the victim as part of the threat.

"So if the parties work out a stipulation on how that comes in, that's fine. You're not required to. But the State has the right to present their case like they think they should present it. And the evidence that this particular defendant had been convicted of the prior attempted murder charges and they are one in the same people is sufficient and should be allowed to be presented to the jury. So I'm going to grant the motion on that grounds."

*The trial*

At trial, Smith moved Judge Merlin Wheeler to reconsider, but he denied the motion. He granted Smith a continuing objection for "any evidence that was described in that motions hearing, so that you don't need to otherwise object." The court also acknowledged the objection during the instructions conference, when Smith objected to the limiting instruction.

In its opening statement, the State told the jury that the State and Smith had stipulated that Smith had been convicted in 2000 of two counts of attempted murder and that Brookshire knew about those prior convictions. Brookshire also affirmed that she knew about Smith's prior convictions. And the stipulation was included in the jury instructions. The district court also gave a limiting instruction: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. It may be considered solely as evidence of the defendant's intent."

The State presented evidence through the testimonies of the 911 dispatcher, Hoffman, and Brookshire. Smith did not present any evidence. The jury found Smith guilty of criminal threat, and the district court sentenced him to 14 months in prison with 12 months of postrelease supervision.

5

Before sentencing, Smith moved for a new trial because one of the jurors had said in a post-trial interview that he knew about Smith's prior conviction even before trial. That juror had not told any other jurors about this. Judge Wheeler denied the motion for a new trial for two reasons. First, the entire jury knew about the conviction by the time of deliberations. Second, neither party had asked during voir dire about Smith's criminal history, so the juror had not been deceitful. He also noted that if there were error, the limiting instruction mitigated any prejudice.

Smith timely appeals.

*Did the District Court Err in Admitting Evidence of Smith's Prior Crimes?*

We first address Smith's argument that the district court improperly admitted evidence of his prior convictions. Smith claims that the district court failed to correctly apply the test for admission of K.S.A. 60-455 evidence—it did not apply the second or third parts of the applicable three-part test.

*Standard of Review and K.S.A. 2019 Supp.60-455(b) Test*

"When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo." *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006). The proper basis here for considering the admission of evidence of prior crimes or convictions is K.S.A. 2019 Supp. 60-455(b). See *Gunby*, 282 Kan. at 57 (ending the practice of admission of other crimes and civil wrongs evidence independent of K.S.A. 60-455).

That statute states the general rule that evidence that a person committed a crime on a prior occasion is inadmissible to prove that person's disposition to commit a crime as the basis for an inference that the person committed a crime in the present case. K.S.A.

6

2019 Supp. 60-455(a). But it also states an exception: "such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2019 Supp. 60-455(b).

In determining whether the admission of prior crimes evidence is proper under K.S.A. 2019 Supp. 60-455(b), the district court must apply a three-step test. See *Gunby*, 282 Kan. at 57. Each step has a corresponding standard of review:

- *Probative*: First, the district court considers whether the evidence of a prior crime has any tendency in reason to prove a nonpropensity fact, such as "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2019 Supp. 60-455(b). We review this step under an abuse of discretion standard. *State v. Rosa*, 304 Kan. 429, 436, 371 P.3d 915 (2016) (citing *State v. Preston*, 294 Kan. 27, 32-33, 272 P.3d 1275 [2012]). And, here, Smith bears the burden of proving the district court abused its discretion. See *State v. Reid*, 286 Kan. 494, 495, 186 P.3d 713 (2008).

- *Material*: Second, the district court must determine whether the nonpropensity fact, such as intent, has a legitimate and effective bearing on the decision of the case and is disputed. In other words, it must be material. We review de novo whether a fact is material. *Rosa*, 304 Kan. at 436.

- *Probative value outweighs prejudicial effect*: Third, the court must consider whether the probative value of the evidence outweighs its prejudicial effect. We review this step under an abuse of discretion standard, and Smith bears the burden of proving an abuse of discretion. See *Reid*, 286 Kan. at 495.

When considering prior crimes evidence under K.S.A. 2019 Supp. 60-455(b), the district court must apply this test. Failure to do so is error. See *Gunby*, 282 Kan. at 57. And if the district court admits prior crimes evidence under K.S.A. 60-455 in a jury trial,

it must provide a limiting instruction to inform the jury of the specific purpose for which the evidence was admitted. *State v. Haygood*, 308 Kan. 1387, 1392-93, 430 P.3d 11 (2018). The district court did so here.

*Analysis*

The State charged Smith with criminal threat. A criminal threat is any threat to commit violence communicated with intent to place another in fear. K.S.A. 2019 Supp. 21-5415, *held unconstitutional on other grounds by State v. Johnson*, 310 Kan. 835, 450 P.3d 790 (2019). This statute prohibits only true threats. *State v. White*, 53 Kan. App. 2d 44, 57-58, 384 P.3d 13 (2016). As the United States Supreme Court has said:

> "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. [Citations omitted.]" *Virginia v. Black*, 538 U.S. 343, 359-60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

A threat "'need not, unless the statute expressly so requires, be in any particular form or in any particular words, and it may be made by innuendo or suggestion, and need not be made directly to the intended victim.'" *State v. Rivera*, 42 Kan. App. 2d 914, 919-20, 218 P.3d 457 (2009) (citing *State v. Knight*, 219 Kan. 863, 866, 549 P.2d 1397 [1976]). In determining whether a criminal threat occurred, the court should consider all the circumstances and the relationship of the parties. See *Rivera*, 42 Kan. App. 2d at 920.

8

*The district court properly found probativity.*

The State argued that Smith's prior convictions were probative of his intent to place Brookshire in fear. The district court agreed. Smith does not argue on appeal that the district court abused its discretion in finding the evidence probative. Instead, Smith contends that the district court failed to address and properly apply the next two steps.

*The district court failed to determine materiality.*

In the second step of the analysis, the district court must decide whether the K.S.A. 2019 Supp. 60-455(b) fact is in dispute or substantially at issue. Our courts have used those terms interchangeably. See *State v. Preston*, 294 Kan. 27, 32, 272 P.3d 1275 (2012) ("Material evidence is evidence that '"has a legitimate and effective bearing on the decision of the case and is in dispute."'"); *State v. Johnson*, 222 Kan. 465, 469, 565 P.2d 993 (1977) (stating a district court must "determine that fact is a disputed material fact i.e. that it is substantially in issue").

Smith is correct that the district court did not decide whether intent was material under K.S.A. 2019 Supp. 60-455. Under K.S.A. 2019 Supp. 60-455(b), intent is material when the defendant provides an innocent explanation for the acts. See *Rosa*, 304 Kan. at 436-37; *State v. Dotson*, 256 Kan. 406, 413, 886 P.2d 356 (1994). The district court failed to determine whether Smith offered an innocent explanation.

Yet we review this issue de novo. See *Rosa*, 304 Kan. at 436. The record reveals that intent was in dispute because Smith did provide an innocent explanation for his statement. Smith's theory of defense was that although he had said "kill her," he intended his statement as a threat to kill the dog, not to kill his mother. And Brookshire offered some evidence supporting that theory. Because intent was in dispute, evidence of Smith's prior crimes was material. So the district court's failure to decide materiality is harmless.

9

*The district court failed to weigh the probative value against the prejudicial effect.*

The third step in evaluating K.S.A. 60-455 evidence is to weigh the probative value of the prior crimes evidence against the risk of undue prejudice. *State v. Higgenbotham*, 271 Kan. 582, 589, 23 P.3d 874 (2001). If the probative value does not outweigh the prejudicial effect, the evidence should not be admitted. See *Haygood*, 308 Kan. at 1393; *State v. Bly*, 215 Kan. 168, 175, 523 P.2d 397 (1974) (stating if the potential for natural bias and prejudice overbalance the contribution to the rational development of the case, the evidence must be barred).

Under this analysis, we are concerned only with undue or unfair prejudice. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). The potential undue prejudice in admitting K.S.A. 60-455 evidence generally is:

- A jury might exaggerate the value of the prior crimes as evidence allowing it to infer that the defendant committed the charged crime because he or she committed a similar crime in the past;
- A jury might conclude the defendant deserves punishment because he or she is a general wrongdoer or evil person, even if the State has not established his or her guilt beyond a reasonable doubt; and
- A jury might conclude that his or her evidence or testimony should not be believed because the defendant is a criminal. *Gunby*, 282 Kan. at 48-49.

Our Supreme Court recently articulated an analytical framework for the district courts to apply in conducting this third step of the analysis:

> "In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how

10

seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors: the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct." *State v. Boysaw*, 309 Kan. 526, 541, 439 P.3d 909 (2019).

Because Smith was tried before *Boysaw* was decided, the district court did not have the benefit of *Boysaw*'s suggested analysis.

The State contends that the district court nonetheless engaged in the proper analysis by suggesting that the parties stipulate to Smith's prior convictions so the detective would not need to testify about the details of Smith's prior case. That helps minimize potential prejudice, but that is insufficient. The record does not show that the district court explicitly inquired into whether the probative value of the evidence outweighs its prejudicial effect. This was error. A court cannot "skirt[] carrying out its duty to protect a defendant from undue prejudice." *State v. Claerhout*, 310 Kan. 924, 931, 453 P.3d 855 (2019).

But the Kansas Supreme Court has recently reminded us that a "'district court's admission of evidence under K.S.A. 60-455 may be upheld on review even if its rationale was in some way erroneous if an appellate court determines that the evidence was otherwise admissible under the statute.'" *Haygood*, 308 Kan. at 1397, citing *State v. Boggs*, 287 Kan. 298, 310, 197 P.3d 441 (2008) (citing *State v. Vasquez*, 287 Kan. 40, 51-53, 194 P.3d 563 [2008]; *Reid*, 286 Kan. at 509-12). We do so here.

Even had the district court applied the *Boysaw* analysis, the result would have been the same. The probative value of evidence of Smith's other crimes was significant. His prior crimes were clearly proved by the fact of his convictions. His crimes of

attempted second-degree murder are quite probative of the material fact sought to be proved—Smith's intent to place his mother in fear. Smith's intent was disputed by the alternative interpretation of his threat argued by his counsel, and Smith does not assert that the State could have obtained any less prejudicial evidence to prove his intent.

The possible prejudicial effect of evidence of Smith's prior crimes was lessened because the prior crimes evidence was presented by stipulation. And because of the stipulation, proving Smith's prior crimes was not time consuming. Nor did the prior crimes evidence distract from the central issue of the case—whether the jury believed or rejected Brookshire's innocent explanation for Smith's threat. Because the jury's primary task was to judge Brookshire's credibility—not Smith's—the likelihood that the prior crimes evidence will contribute to an improperly based jury verdict is minimal. All K.S.A. 60-455 evidence carries prejudice. But the prejudice is not undue when, as here, the probative value outweighs the prejudicial effect. See *Gunby*, 282 Kan. at 48-49. We find no error in the result the district court reached.

*Reversibility*

But even if we had found that the district court abused its discretion in not applying the proper test, we would find that error harmless. If a district court errs in applying the test for the admission of K.S.A. 60-455 evidence, we apply a statutory harmless error analysis under K.S.A. 2019 Supp. 60-261 to determine whether reversal is required. *Gunby*, 282 Kan. at 57-59; see *State v. Lowery*, 308 Kan. 1183, 1235, 427 P.3d 865 (2018). So the State bears the burden to show that, in light of the entire record, there is no reasonable probability that the district court's admission of Smith's prior convictions of attempted murder affected the jury's verdict finding him guilty of criminal threat. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

*The limiting instruction*

First, the State first contends that the limiting instruction minimized the prejudicial effect of Smith's prior convictions. When reviewing for harmless error, we consider whether any harm caused by the error was removed or mitigated by judicial admonition, jury instruction, or other curative action. See *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011). A limiting instruction acts as a prophylactic against the danger the jury will view prior crimes evidence as tending to show propensity. See *Claerhout*, 310 Kan. at 932.

The district court gave a proper limiting instruction. It told the jury that Smith's prior convictions "may be considered solely as evidence of the defendant's intent." And we generally presume that a jury follows a limiting instruction. See *State v. Boothby*, 310 Kan. 619, 629, 448 P.3d 416 (2019). We thus agree that the limiting instruction minimized the prejudicial effect of admitting Smith's prior convictions. See *State v. Mitchell*, 220 Kan. 700, 703, 556 P.2d 874 (1976) (stating that these cases seem to turn on whether a limiting instruction was given and the degree of prejudice).

*The evidence was overwhelming.*

Second, the State argues that Smith's guilt was overwhelming so there was no reasonable probability the error affected the trial's outcome.

> "The jury heard the 911 call in which Smith fumed in a drunken rage, repeatedly calling his mother 'bitch' and 'motherfucker.' . . . The jury heard Brookshire tell them that Smith twice took and threw her phone so she could not talk to the police. . . . And the jury heard Smith say, 'I'm gonna' kill her.' . . . There is no doubt Smith is guilty."

We agree the State presented compelling evidence that Smith threatened to kill his mother.

The dispatcher testified that she heard Smith say, "I'm going to kill her." She understood that Smith was talking about killing Brookshire. She testified that Brookshire was "hysterical" during the 911 call and she was not able to get Brookshire to calm down. Brookshire told her it had been going on all day and was getting physical. The dispatcher had dealt with Smith before and knew he was a violent registered offender. While the dispatcher was talking to Brookshire, Smith at times directed his comments to the dispatcher. For example, he told her she'd better bring the whole county because he was not going to go easily. He also directed to her his statement of intent to kill his mother— "I'm gonna kill her."

The State presented the recording of the 911 calls to the jury. It heard Smith say, "I'm gonna kill her." The jury was able to listen to the tone in Smith's voice, to hear his statements degrading and cussing at his mother, his statements to the dispatcher, and the tone and context of his statement— "I'm gonna kill her." It could also hear Brookshire's voice, hear her crying or sobbing, and hear her pleas for help. The dispatcher's testimony, coupled with the recording of the 911 calls, provides strong evidence favoring the State's position.

So does Brookshire's written statement. The officer who took Brookshire's written statement served as a mere scrivener. He wrote what Brookshire told him soon after the incident occurred. Brookshire immediately reviewed the written statement, agreed with it, then signed it. Brookshire's written statement, admitted at trial, said that Smith told his mother "he was going to kill me." We reproduce it here:

14

"Early this morning Brian Smith was already drunk. I left b/c he was getting obnox.

"When I came home he was up @ Jo Evans. I called him. He said he had to take Jo to get a bottle. After that he came home and passed out in the truck. I took the keys out of the truck. He woke up and came inside. He cussed me for not waking him up. I told him I wasn't going to put up with him being drunk and cussing me out every night.

"He was cussing me. I rolled the newspaper up. I told him to stop it. He got up from sitting on the sofa. I hit him 2 times with the newspaper on his arm. He took the newspaper from me and went to hit me. I got my arm up to block my face. He hit me in the arm with the newspaper 1 time.

"I told him I was getting [rid] of the dog. He told me he was going to kill me. We started yelling @ each other. He kept getting in my face, cussing. I told him I was going to call the police. He said, you ain't either bitch. I called 911. He took the phone from me and [threw] it. I went and picked the phone up. I started to call back. 911 called me back. He took the phone again and [threw] it again. I picked it back up. 911 called me back again. He walked out to the garage. That's when the Officer showed up."

Compelling evidence favors the State's position.

On the other hand, weak evidence favors the defense theory. The sole evidence that Smith may have threatened to kill the dog instead of Brookshire came from Brookshire. Yet her trial testimony waffled, was self-contradictory, and contradicted her earlier statements. At times she said Smith had threatened to kill her. At times she said Smith had threatened to kill his dog. And at times she admitted she just didn't remember what Smith had said or meant. She denied what she had said in her written statement but admitted that it reflected what she had said on the night of the incident. And Brookshire admitted at trial that her memory of the incident was probably better closer to the incident than it was at trial.

This was not a case in which admission of prior crimes evidence could prejudice the defendant by harming his credibility—Smith did not testify. Instead, Smith's

15

conviction depended on which version of Brookshire's testimony the jury believed—her written statement that Smith said he would kill her, or her trial testimony that Smith said he would kill the dog. That was a credibility determination for the jury. See K.S.A. 60-420; 60-422 (permitting extrinsic evidence of a prior contradictory statement to impeach a witness). "Confronting witnesses with evidence that they said different things at different times is one of the ways lawyers can cast doubt on witness credibility." *State v. Palmer*, No. 118,522, 2019 WL 638058, at *3 (Kan. App.) (unpublished opinion), *rev. denied* 310 Kan. 1069 (2019). See, e.g., *State v. Moreno*, No. 118,409, 2019 WL 2402494  (Kan. App. 2019) (unpublished opinion), *rev. denied* 311 Kan. __(February 27, 2020) (noting the State's argument that a witness was "guarded" in her testimony because she did not want the defendant to get in trouble, which explained why her account of the events at trial differed from what she had told people right after the event); *Billington v. Midwest Minerals, Inc.*, No. 118,503, 2018 WL 3796611 (Kan. App. 2018) (unpublished opinion) (noting one party's argument that a witness was not credible because he provided two different versions of how he sustained his injuries: one that arose out of and in the course of employment and one that did not).

That credibility determination was likely based on factors having nothing to do with the jury's knowledge of Smith's prior crimes—factors such as why Smith's mother would say different things at different times and which of her contradictory statements was most likely to be accurate and unswayed by outside influences, wishful thinking, hindsight, or the frailties of memory.

Under the circumstances, we find no reasonable probability that the district court's admission of Smith's prior convictions of attempted murder affected the jury's verdict. Although the district court erred by failing to strictly apply the safeguards of K.S.A. 2019 Supp. 60-455, the error was harmless.

16

Smith also claims that he was denied his right to a fair trial because one of the jurors knew about his criminal history before the jury was selected but failed to disclose his knowledge. But, as Smith recognizes, the success of this argument depends on our finding that the admission of his prior convictions under K.S.A. 2019 Supp. 60-455 was erroneous. Because we have found that the district court properly admitted evidence of Smith's prior crimes under that statute, we need not examine this issue.

Affirmed.